# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6853 | **DATE** | 10/2/2000 |
| **CASE TITLE** | Newell vs. Newell Rubbermaid | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth on the attached order, the Court grants defendants' motion to dismiss plaintiffs' amended complaint.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

OR6 courtroom deputy's initials

number of notices

**OCT 0 4 2000**
date docketed

docketing deputy initials

date mailed notice

ED-7
FILED FOR DOCKETING
00 OCT -3 PM 4: 30

Date/time received in central Clerk's Office

mailing deputy initials

Document Number

28

| | |
|---|---|
| IN RE NEWELL RUBBERMAID INC. SECURITIES LITIGATION | ) ) ) |
| ———————————————— | ) |
| ALFRED G. YATES, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| NEWELL RUBBERMAID, INC.; THOMAS FERGUSON, JOHN J. McDONOUGH, WILLIAM ALLDREDGE, and WOLFGANG R. SCHMITT, | ) ) ) ) ) |
| Defendants. | ) ) |

Case No. 99 C 6853

**DOCKETED**

OCT 0 4 2000

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This case arises from the merger of Rubbermaid Inc. into Newell Co., which was consummated on March 24, 1999 with the formation of a new entity called Newell Rubbermaid Inc. The plaintiffs have made claims under sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§77k(a), 77*l*(a)(2), & 77o, on behalf of a class consisting of the former shareholders of Rubbermaid Inc. who exchanged their stock in the merger, and under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) & 78t(a), on behalf of all who purchased the stock of Newell, Rubbermaid, or Newell Rubbermaid from the date the merger was announced, October 21, 1998, through September 3, 1999.

Plaintiffs have named as defendants Newell Rubbermaid Inc.; its President Thomas

28

Ferguson; its Chief Executive Officer John McDonough; its Vice President of Finance William Alldredge; and Wolfgang Schmitt, formerly CEO of Rubbermaid and now Vice Chairman of Newell Rubbermaid. Plaintiffs allege that the defendants made false statements and concealed material information about Rubbermaid, Newell, and the prospects for the combined company. Defendants have moved to dismiss the complaint for failure to state a claim upon which relief may be granted. Both parties have filed extensive briefs in support of their respective positions, and the Court held oral argument on the motion on July 13, 2000.

### Facts

Newell, like its successor Newell Rubbermaid, is a manufacturer and marketer of consumer products sold to high volume purchasers, such as discount stores, hardware stores, and the like. Since 1990, Newell has pursued an aggressive acquisition strategy, completing over 20 acquisitions and increasing its sales by nearly $3 billion annually; its 1997 sales, plaintiffs say, were $3.3 billion. In integrating the acquired businesses, Newell relies on its so-called "Newellization" technique, which is the company's "profit improvement and productivity enhancement process that is applied to integrate newly acquired product lines" by, among other things, "establishing a more focused business strategy, improving customer service, reducing corporate overhead through centralization of administrative functions and tightening financial controls." Am. Cplt. ¶¶31-32.

Rubbermaid was also a manufacturer and marketer of consumer products. Like Newell, Rubbermaid sold those products to discount stores, grocery stores, hardware stores, and the like. In 1997, its sales totaled $2.4 billion. Id. ¶33. On October 20, 1998, Newell and Rubbermaid entered into a merger agreement the effect of which was to merge Rubbermaid into Newell,

2

naming the newly-formed entity Newell Rubbermaid Inc. The merger agreement provided that each outstanding share of Rubbermaid stock was to be exchanged for 0.7883 shares of Newell stock, which would then be reclassified and converted into Newell Rubbermaid stock. *Id.* ¶34. On February 4, 1999, Newell and Rubbermaid filed with the SEC a joint proxy/registration statement and prospectus. Shareholders of record of both companies as of February 8, 1999 were entitled to vote on the merger. The merger was completed on March 24, 1999. As a result of the merger, Rubbermaid's former shareholders obtained about 41% of the outstanding stock of Newell Rubbermaid. *Id.* ¶35.

Prior to the merger's announcement in October 1998, Newell performed a due diligence investigation of Rubbermaid. Plaintiffs allege that as a result of this process, defendants became aware of significant problems at Rubbermaid which they did not disclose in the prospectus or elsewhere. *Id.* ¶36. Specifically, they say that Rubbermaid used a misleading financial reporting technique through which it under reported its expenses by $40 million over the three year period from 1996 through 1998, *see id.* ¶¶37-38; that Rubbermaid had maintained its market share by giving major customers deep discounts, *id.* ¶39; that it had experienced significant problems in shipping product that led to imposition of late-shipping penalties by customers, *id.* ¶40; and that it had induced customers to accept delivery of product that they had not agreed to purchase in order to permit Rubbermaid to meet its financial reporting goals and had reported these artificial "sales" in violation of generally accepted accounting principles (plaintiffs specifically allege $8 million to $10 million in such artificial "sales" to Federal Wholesale), *id.* ¶¶40-44.

Plaintiffs allege that on October 21, 1998, the day after they signed the merger agreement, Newell and Rubbermaid issued a press release which stated that:

3

- the merger would create synergies, a "stronger combined presence," "broader acquisition opportunities," and a better ability to serve Europe;

- that "[b]y 2000 these efforts and opportunities are expected to produce an increase over anticipated 1998 results of $300 to $350 million in operating income for the combined company";

- that Newell was "fully confident" in its ability to integrate Rubbermaid; and

- that the merger "provides superior value for [Newell] shareholders."

*Id.* ¶¶45-48. On the same day, Newell filed a Form 8-K with the SEC, including the press release as an exhibit. Plaintiffs say that the press release, and thus the Form 8-K, was misleading because defendants did not disclose what they had learned about Rubbermaid's financial reporting practices. Plaintiffs contend that the undisclosed matters created significant hurdles for Newell to overcome, called its strategies into question, and reflected that the price it had agreed to pay for Rubbermaid was too high. *Id.* ¶¶5-7, 50.

On November 4, 1998, Rubbermaid filed its Form 10-Q with the SEC, reporting financial results for the quarter ending on October 2, 1998. Plaintiffs say that this report was false because it did not disclose the financial reporting practices and other adverse matters described earlier. *Id.* ¶¶54-55. They also allege that "Rubbermaid management" made misleading statements to securities analysts that the company's fourth quarter was "on track." *Id.* ¶¶56-57.

On December 10, 1998, plaintiffs say, Newell issued a press release in which it stated that it believed that "1999 will be a strong year" due to, among other things, "the 'Newellization' opportunities that come with our strategic 1998 acquisitions." As Rubbermaid was one of the 1998 acquisitions, this prediction, plaintiffs say, was untrue. *Id.* ¶¶58-59.

4

On February 4, 1999, Newell filed with the SEC a Registration Statement that contained

the prospectus and joint proxy statement sent to both Newell's and Rubbermaid's shareholders in

connection with the upcoming vote on the merger. *Id.* ¶60. In the prospectus, Newell's board of

directors represented that it "believes that the combined company will be well-positioned to

realize significant increases in operating income," based on Newell's past successes in

integrating acquired companies, the compatible nature of the companies' businesses and their

complementary strengths, and "Newell management's review of Rubbermaid's operations and

opportunities expected to be created through the merger." Prospectus, p. 23.[1] The Newell board

reported that "Newell management's review of Rubbermaid and analysis of the proposed merger

identified $300-$350 million of expected annual operating income improvements to be made by

the year 2000: $115-$130 million in 1999 and an additional $185-$220 million in the year

2000." *Id.* The prospectus proceeded to list "four major initiatives" that would be implemented,

giving a specific range of "operating income improvement" expected as a result of each initiative

in 1999 and 2000. *Id.*, pp. 23-24. At the end of the discussion of the expected operating income

improvements, the following statement appeared: "No assurance can be given that the operating

income improvements described above will be achieved, or, for that matter, achieved on the

---

[1] In addressing defendants' motion to dismiss, it is appropriate for the Court to consider
the text of the prospectus, which though not attached to plaintiffs' complaint is central to their
claims and is quoted liberally in the complaint. And the Court may do so without converting the
motion to a summary judgment motion. "Documents attached to a motion to dismiss are
considered part of the pleadings if they are referred to in the plaintiff's complaint and are central
to his claim." *Wright v. Associated Insurance Companies,* 29 F.3d 1244, 1248 (7th Cir. 1994);
*see also, e.g., Venture Associates Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431 (7th
Cir. 1993). *Accord, Helwig v. Vencor, Inc.,* 210 F.3d 612, 618 (6th Cir. 2000).

timetable discussed above. See 'Forward-Looking Statements May Prove Inaccurate' and 'Risk Factors.'" *Id.*, p. 24.

The referenced section on "Forward-Looking Statements," which began on page 94 of the prospectus, contained a general description of what constitutes a "forward looking statement" and then said, "You should understand that forward-looking statements are not guarantees since there are inherent difficulties in predicting future results. Actual results could differ materially from those expressed or implied in the forward-looking statements." *Id.*, p. 94. The prospectus went on to report that "there can be no assurance" that Newell had correctly identified and assessed the factors relating to the companies' businesses; that the analysis, or the information on which it was based, was complete or correct; or that Newell's strategies would be successful. *Id.* The prospectus also discussed other general factors concerning the state of the world economy, conditions affecting trade, and the nature of the marketplace, that might have an impact on the projections. It also stated that "[t]he ability of Newell to integrate [Rubbermaid's] businesses successfully, given the size of Rubbermaid and the differences in corporate cultures, as well as to fully realize anticipated operating income improvements, are important factors in Newell's future earnings growth." *Id.*, p. 95.

The section on "Risk Factors," which began on page 14 of the prospectus, identified a series of factors that shareholders should consider. The first of these stated as follows:

**We may not achieve the significant increases in operating income we expect to result from the integration of Rubbermaid into Newell.**

We expect the integration of Rubbermaid into Newell to result in significant increases in operating income. Over the last 30 years, Newell has successfully acquired and integrated almost 100 companies. The Rubbermaid acquisition, however, is substantially larger than any previous acquisition by

6

Newell. There can be no assurance that we will realize the operating income improvements that we anticipate from integrating our operations as fully or as quickly as we expect.

*Id.,* p. 14. The prospectus also identified as "risk factors" the possibility of "Y2K" computer problems; the fact that the merger would cause a dilution of Newell shareholders' interest in the company; the fact that Newell would incur a one-time charge in connection with the integration, the amount of which could not be predicted, that would affect operating results when the charge was taken; and that if the market price of Newell's stock dropped prior to consummation of the merger, the value received by Rubbermaid's shareholders would decrease. *Id.,* pp. 14-15. The final "risk factor" was essentially a preview, in abbreviated form, of the section on "forward-looking statements." *Id.,* p. 16.

Plaintiffs allege that defendants made false and misleading statements after announcing the merger. They contend that defendants issued a series of press releases and gave information to analysts concerning the benefits of the merger, all of which, plaintiffs say, caused the price of Newell Rubbermaid stock to increase. According to plaintiffs, defendants knew better, due to their knowledge of the matters discussed above and their supposed realization that the "Newellization" method would be inadequate to deal with these problems.

On February 9, 1999, Rubbermaid issued a press release announcing an earnings increase for the fourth quarter of 1998. The release also said that an "initiative to improve procurement and lower costs is well underway" and that "we are ready to give the combined company a fast start once shareholders approve the merger." Plaintiffs say the press release was misleading because it did not disclose the unfavorable matters previously discussed. Am. Cplt. ¶¶62-63.

On March 3, 1999 (still prior to the merger), Newell repeated the prospectus' prediction

of $300-$350 million in cost savings. *Id.* ¶¶64-65. On March 19, Newell filed its Form 10-K for 1998 with the SEC. Plaintiffs allege that the Form 10-K failed to disclose Rubbermaid's business practices discussed earlier, *id.* ¶¶66-67; but as the merger with Rubbermaid did not take place in 1998, there was no occasion for Newell to do so in the Form 10-K.

Newell Rubbermaid filed its Form 10-Q for the first quarter of 1999 (which ended just one week after consummation of the merger) on May 14, 1999. The Form 10-Q noted that Rubbermaid's gross margin had been lower in the first quarter of 1999 as compared with the first quarter of 1998. The Form 10-Q stated that "[a]s the 1998 acquisitions and Rubbermaid divisions are integrated, [Newell] expects their gross margins to improve." *Id.* ¶70.

On May 25, 1999, a market analyst with Janney Montgomery Scott said that "[a]fter recent discussions with management, we believe that Newell is where it needs to be regarding the Newellization of Rubbermaid." *Id.* ¶72. On June 2, CIBC World Markets Corp. issued a report stating that management "believes it is on or ahead of schedule in most aspects of the integration." *Id.* ¶74. An analyst with LJR Great Lakes Review similarly reported on June 7, 1999 that "[t]he integration of Rubbermaid is going as planned" and that Newell had "reiterated its belief that it will achieve operating income improvements of $115 to $130 million in 1999 and $185 to $220 million in 2000." *Id.* ¶73.

On July 27, 1999, Janney Montgomery Scott reported that after a conference call with Newell Rubbermaid management, "we feel comfortable that Newell's management has its finger on the pulse of Rubbermaid's issues, and that the identified cost saving of $300-350 million by the end of 2000 is still an achievable target." *Id.* ¶76. The following day, an analyst with Bear Stearns likewise reported that "[t]he Rubbermaid integration appears to be producing the

expected cost savings" and that "[m]anagement seems confident that target savings of $115-$130 million will be reached this year." *Id.* ¶75.

Newell Rubbermaid filed its Form 10-Q for the second quarter on August 13, 1999. It reported that net income was $112 million lower for that quarter than for the second quarter of 1998. The Form 10-Q also reported that "gross margins at the Newell core businesses were maintained while the 1998 acquisitions had gross margins which were lower than the Company's average gross margins and the Rubbermaid divisions' gross margins declined in the second quarter of 1999 versus the second quarter of 1998." Nonetheless, Newell Rubbermaid stated, "[a]s the 1998 acquisitions and Rubbermaid divisions are integrated, the Company expects their gross margins to improve." *Id.* ¶¶78-79.

On August 26, 1999, an analyst with CIBC World Markets reported that Newell Rubbermaid management "is more comfortable" with a 1999 earnings estimate of $1.80 per share "despite its $1.80 to $1.90 announced guidance." *Id.* ¶81. But one week later, on September 3, 1999, Newell Rubbermaid announced that it was lowering its earnings estimates for the third quarter and full year 1999 to $1.65-$1.75 per share. *Id.* ¶83. In the same press release, the company stated that "[a]lthough volume at Rubbermaid is also below expectations, the integration process remains on plan." *Id.* The lowered estimate, plaintiffs say, resulted in a one-day 20% drop in the price of Newell Rubbermaid's stock. *Id.* ¶85. On September 7, Newell Rubbermaid announced that "[t]he Rubbermaid integration remains on plan. Unforecasted promotional commitments made by previous management have run their course and will not be repeated." *Id.* ¶86. Following this announcement, plaintiffs say, the stock price again fell by a significant amount. *Id.* ¶88. Several weeks later, an article appeared in *Business Week*

attributing the following to Newell Rubbermaid's CEO, Edward McDonough:

> After the merger was signed, McDonough got a closer look at the
> skeletons in Rubbermaid's closet. According to Newell,
> Rubbermaid salespeople had boosted orders by offering deep price
> discounts. Now Newell is having a tough time undoing the
> damage.

*Id.* ¶89.

## Plaintiffs' claims

Plaintiffs have asserted claims under both the Securities Act of 1933 and the Securities Exchange Act of 1934.

Plaintiffs have brought Counts 1, 2, 3, and 4 on behalf of the former Rubbermaid shareholders who received Newell Rubbermaid stock as part of the merger. Counts 1 and 2 are brought against Newell Rubbermaid (Count 1) and the individual defendants (Count 2) under section 11 of the Securities Act, 15 U.S.C. §77k(a), which permits an action for damages by a person who acquired stock pursuant to a registration statement that contained material misstatements or omissions of fact. Count 3 is brought against Newell Rubbermaid under section 12(a)(2) of the Securities Act, 15 U.S.C. §77*l*(a)(2), which provides a remedy for purchaser of stock offered or sold pursuant to a materially misleading prospectus or oral communication. Count 4 is brought against the individual defendants under section 15 of the Securities Act, 15 U.S.C. §77o, which provides that every person who "controls" any person liable under section 11 or section 12 is jointly and severally liable.

Plaintiffs have brought Counts 5 and 6 on behalf of all persons who purchased the stock of Newell, Rubbermaid, or Newell Rubbermaid between October 21, 1998 and September 3, 1999, as well as the former Rubbermaid shareholders who received Newell Rubbermaid stock as

part of the merger. In Count 5, plaintiffs allege that all of the defendants made misrepresentations and omissions of material fact in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5. In Count 6, plaintiffs assert a claim against the individual defendants under section 20(a) of the Securities Exchange Act, which provides for joint and several liability of any person who "controls" any other person liable under the Act. 15 U.S.C. §78t(a).

## Analysis

In determining a motion to dismiss for failure to state a claim, the Court accepts as true all of the plaintiff's well-pleaded factual allegations and draws reasonable inferences in the plaintiff's favor. *E.g., Bontkowski v. First National Bank of Cicero,* 998 F.2d 459, 461 (7th Cir. 1999). The Court may dismiss a complaint only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spaulding,* 467 U.S. 69, 78 (1984). As to several of the elements of plaintiffs' claims, however, particularized pleading requirements are imposed either by Federal Rule of Civil Procedure 9(b), or by recent amendments to the federal securities laws, or both. We will discuss this where pertinent.

### A.    Securities Act claims

To state a claim under section 11 or section 12(a)(2) of the Securities Act, plaintiffs must allege that defendant made untrue statements of material fact or omitted material facts in a registration statement or prospectus or in oral communications (the latter under §12(a)(2) only). *See, e.g., Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 546 (8th Cir. 1997); *Davis v. USN Communications, Inc.,* 73 F. Supp. 2d 923, 930 (N.D. Ill. 1999). These statutes do not include a

11

scienter requirement. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 382 (1983); *Casella*

*v. Webb,* 883 F.2d 805, 809 (9th Cir. 1989); *Wertheim & Co. v. Codding Embryological*

*Sciences, Inc.,* 620 F.2d 764, 767 (10th Cir. 1980).

A misstatement – a term we use to describe both misrepresentations and omissions – is

material it if would be viewed by a reasonable investor as significantly altering the total mix of

available information. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988); *Parnes,* 122

F.3d at 546. As a general rule, determination of materiality presents factual issues that a jury

must decide. If, however, a reasonable investor could not have been swayed by an alleged

misstatement, a court may determine as a matter of law that the misstatement was not material.

*See, e.g., Parnes,* 122 F.3d at 546. For example, an alleged misstatement "may ... present or

conceal such insignificant data that, in the total mix of information, it simply would not matter to

a reasonable investor." *Id.* at 547. In addition, "some statements are so vague and such obvious

hyperbole that no reasonable investor would rely on them." *Id.*

Some of the statements that plaintiffs allege were misleading are too vague to be

actionable; they are, in the words of the Seventh Circuit, mere "puffery," lacking "the requisite

specificity to be considered anything but optimistic rhetoric." *Searls v. Glasser,* 64 F.3d 1061,

1066 (7th Cir. 1995); *see also, e.g., Eisenstadt v. Centel Corp.,* 113 F.3d 738, 746 (7th Cir.

1997). This includes statements such as the claim that the combination was "an exceptional

strategic fit"; that the combined companies' products "will be attractive to consumers"; that this

was a "major development" in Newell's growth strategy; references to synergies that

management expected to result from the merger; and other similar statements. These statements

"contain[ ] no useful information upon which a reasonable investor would base a decision to

invest." *Searls,* 64 F.3d at 1066.

Several of the alleged misstatements attacked by plaintiffs do involve specifics and thus might be actionable under the 1933 Act if they were material. In this category are the alleged nondisclosure of Rubbermaid's under reporting of expenses by $40 million from 1996 through 1998; the alleged misreporting as actual sales of product shipped that customers had not ordered; the alleged nondisclosure of the fact that Rubbermaid had experienced shipping problems that caused it to have to pay penalties to customers; and the company's alleged practice of offering of substantial price discounts to customers.

Defendants argue that the alleged misstatements regarding undisclosed expenses and improperly recognized revenues are immaterial as a matter of law because the amounts in question were minuscule when compared with Rubbermaid's overall revenues. There is ample authority supporting the proposition that when it is clear that a particular financial misstatement could not possibly be significant to a reasonable investor due to its small magnitude, a court may properly determine on a motion to dismiss that the misstatement was immaterial as a matter of law. *See Parnes,* 122 F.3d at 547 (overstatement of assets by $6.8 million, 2% of company's total assets, immaterial as a matter of law); *Glassman v. Computervision Corp.,* 90 F.3d 617, 633 & n.26 (1st Cir. 1996) (overstatement of revenues by 3%-9% immaterial); *Ganino v. Citizens Utilities Co.,* 56 F.Supp. 2d 222, 227 (D. Conn. 1999) (1.7% overstatement of revenue immaterial).

The prospectus disclosed that Rubbermaid had revenues exceeding $2.3 billion per year in 1996 and 1997, and that its 1998 revenues were on track to match or exceed that amount. Thus the company's total revenues for the three years during which the alleged under reporting

of expenses took place totaled around $7 billion. Undisclosed expenses of $40 million over this period, even when added to allegedly improperly recognized revenues of $10 million, amount to nothing more than pocket change when compared with Rubbermaid's overall revenues – around ½ of 1% of the total. Our view of the magnitude of the misstatement is unchanged even if we compare the misreporting with Rubbermaid's bottom line. The company's before-tax income amounted to more than $400 million over this same period; the allegedly undisclosed expenses of $40 million constitute less than 10% of this total. It is hard to see how any Rubbermaid investor trying to decide whether to vote in favor of the merger would think it significant that the company's actual before-tax income might have been just 10% lower than the disclosed amount. Even if knowledge of the alleged under reporting of expenses and the slight over reporting of income might suggest that Rubbermaid was facing problems ahead, it would seem that if anything this would make the Rubbermaid shareholder *more* likely to want the merger to take place, in the hopes that the company's problems would be worked out by new management or would make an even smaller bottom-line impact on a much larger combined entity.[2]

With regard to the alleged improper reporting of sales (merchandise shipped to customers that had not placed orders), the amounts involved are even smaller than the alleged misstatement of expenses. And there is perhaps an even greater problem with the purported materiality of this alleged misstatement. If the customers in question did not want the merchandise at all,

---

[2]  We reject plaintiffs' argument that a reasonable Rubbermaid shareholder, faced with the undisclosed information, might have thought she would be better off without the merger because Rubbermaid's problems might drag down the combined company. The undisclosed matters, minuscule though they were with respect to Rubbermaid's overall finances, were doubly so with respect to the combined company, which had approximately twice Rubbermaid's annual revenues.

presumably they sent it back; if properly reported, the return of merchandise would result in a charge against gross sales. Though the return conceivably might take place in a later reporting period than the recording of the "sale," when considered over time the improperly-recorded sales would be washed out by the charge-backs. If, on the other hand, the customers *did* want the merchandise, but just not as early as it was shipped, the misreporting again would not inflate overall sales revenues over the long haul, but rather would simply shift revenues to an earlier reporting period than was proper. Inflating such revenues in year 1 lowers them in year 2. Plaintiffs fail to explain how a reasonable investor, looking at the five years of Rubbermaid financial figures set forth in the prospectus, *see* Prospectus, p. 13, would have been at all affected by some slight shifting of revenues between years. This is so even if, as plaintiffs argue, the $8-$10 million they can specifically identify does not represent the entire picture.

This leaves the alleged failure to disclose the fact that Rubbermaid had a practice of offering significant discounts to customers and often had to pay penalties for late shipments. But sales discounts translate to lower revenues, and penalties result in higher expenses; both are reflected in financial statements, absent misreporting, which plaintiffs do not allege took place. Plaintiffs' real contention appears to be that Rubbermaid's discounting practices and its shipping difficulties were significant issues that made it unlikely that the merger would yield positive results, despite defendants' predictions of the positive benefits of the merger and the impending "Newellization" of Rubbermaid. In that case, the alleged nondisclosure is appropriately analyzed under the rubric of allegedly misleading "forward-looking statements," not as a material misstatement of *existing* information, for here none is alleged.

Finally, as noted above, some of the alleged misstatements involve so-called "forward-

looking statements," that is, projections of future results. These include the claim that the merger would result in enhanced revenue of some $300 million over a two year period through the "Newellization" process. Plaintiffs allege that this statement was both material and false; namely that the prediction was a highly significant factor that any reasonable Rubbermaid shareholder would have taken into account, and that the defendants knew or reasonably should have known that it would not come true because of all the previously discussed problems at Rubbermaid.

"Projections which turn out to be incorrect are not fraudulent simply because later events show that a different projection would have been more reasonable." *Grassi v. Information Resources, Inc.,* 63 F.3d 596, 599 (7th Cir. 1995). Even before the 1996 enactment of the Private Securities Litigation Reform Act, for a projection to constitute an actionable misstatement (at least under the Securities Exchange Act), the plaintiff had to allege specific facts indicating that the defendants lacked any reasonable basis for the statement at the time they made it. *See, e.g., In re Healthcare Compare, Inc.,* 75 F.3d 276, 281 (7th Cir. 1996) (Rule 10b-5 case) (citing cases).

In the PSLRA, Congress enacted a "safe harbor" for forward-looking statements in cases under the Securities Act. 15 U.S.C. §77z-2. The statute defines the term "forward looking statement" to include projections of revenues, income, earnings, etc.; statements of plans and objectives for future operations; statements of future economic performance; and statements of assumptions underlying any of these. *Id.* §77z-2(i)(1). The PSLRA provides that a defendant is not liable with respect to any such forward-looking statement (whether oral or written) that is identified as such and is either (1) accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the

forward looking statement"; (2) immaterial; or (3) not demonstrated to have been made with actual knowledge by the maker of the statement that it was false or misleading. *Id.* §77z-2(c). Thus a claim under the Securities Act involving forward-looking statements now appears to require, for all practical purposes, proof of scienter.

The facts plaintiffs allege to support the proposition that defendants knew the projections of future operating income improvements were false are the same matters we have already discussed: Rubbermaid's alleged misreporting of $40 million in expenses over three years; its allegedly improper recognition of $8-$10 million in income; and its shipping problems and its practice of providing customers with significant discounts. Careful examination of the projections, however, reveals that these problems have no relationship with the projected income enhancements. Put another way, the claim that defendants were aware of the allegedly undisclosed problems in no way indicates that they knew the particular projections they made were without basis.

The prospectus did not simply state projections; it provided a specific and detailed description of exactly how Newell hoped to attain them. As indicated earlier, the prospectus described "four major initiatives" through which Newell expected to attain the improvements. The first involved improving Rubbermaid's customer service. Newell stated that 98% of its own orders are shipped on time and complete within 2-3 days, but that "Rubbermaid's service levels are not consistently at that level," which can "lead[ ] to higher returns and allowances and promotional requirements." By improving Rubbermaid's service levels to Newell's standards, the prospectus stated, Newell expected to improve income by $5 to $10 million in 1999 and $25 to $30 million in 2000. Prospectus, p. 24.

17

The second initiative involved restructuring and integrating Rubbermaid's operations. By improvements in raw material purchasing, purchasing more efficient equipment, improving logistics, and integrating United States and European facilities, Newell expected to improve operating income by $80 to $85 million in 1999 and $40 to $45 million in 2000. Third, Newell planned to restructure and integrate Rubbermaid's administrative functions into Newell, by reducing overhead, centralizing credit and collections, computer information services, and accounts payable. The prospectus stated that from this Newell expected income improvements of $30 to $35 million in 1999 and $50 to $55 million in 2000. The fourth initiative involved "other anticipated synergies," including new market opportunities, internal and international growth opportunities, acquisition opportunities, and incremental cost savings, from which Newell expected to improve operating income by $70 to $90 million in 2000 (no enhancement for 1999 was projected). Again, as noted earlier, the prospectus stated that "[n]o assurance can be given that the operating income improvements ... will be achieved, or, for that matter, achieved on the timetable discussed above." *Id.*

In order for a defendant's knowledge of a particular undisclosed fact to suggest that the defendant realized that a prediction of future results was untrue, there has to be a logical nexus between the undisclosed fact and the prediction indicating that the fact has some bearing on whether the prediction can be attained. *See generally Helwig v. Vencor, Inc.,* 210 F.3d 612, 623 (6th Cir. 2000). Plaintiffs have made no effort to associate the allegedly undisclosed or concealed information with the particulars of the projections contained in the prospectus and repeated elsewhere. In fact, none of the undisclosed matters bear any relationship with the projected income improvements, with the exception of the first "initiative." Specifically, nothing

18

about Rubbermaid's accounting practices, shipping problems, or discounting practices would be expected to have any bearing on whether the combined companies would be able to achieve reductions in expenses by integrating administrative functions; improving purchasing practices and enhancing equipment; or finding new growth or acquisition opportunities.

Though Rubbermaid's discounting practices and shipping problems conceivably might have a bearing on whether the combined companies could be expected to achieve greater income by improving Rubbermaid's customer service (the first proposed "initiative"), the matters that were purportedly undisclosed were actually the very basis for that projection. The prospectus disclosed that Rubbermaid had experienced shipping problems and that this could affect returns, allowances, and customer relations; it was by dealing with this very problem that Newell hoped to improve income from Rubbermaid. Under the circumstances, this purportedly undisclosed matter cannot be said to indicate that the projection lacked a reasonable basis.

Plaintiffs have failed to allege any facts indicating that the prediction of future income was without a reasonable basis when it was made or that defendants knew it was false or misleading. Certainly the fact that Rubbermaid had failed to record what was, in the scheme of things, a piddling amount of expenses did not undermine the prediction; the same is true of its apparent over reporting of revenues by an even smaller amount. And aside from knowledge that absorbing and "Newellizing" Rubbermaid would be a significant challenge to Newell -- a risk factor that the prospectus specifically warned about, *see* Prospectus, p. 14 -- plaintiffs have identified nothing specific that would have told Newell management that the hoped-for income improvements could not be met. The Court concludes that plaintiffs have failed to allege facts indicating that the defendants had knowledge that the projections of enhanced income found in

19

the prospectus and in press releases that repeated those projections were false or misleading, or that the projections lacked a reasonable basis when they were made.

For these reasons, Count 1 fails to state a claim upon which relief may be granted. Count 2, plaintiffs' "control person" claim under the Securities Act, necessarily fails because it is premised on Count 1. *See, e.g., Suna v. Bailey Corp.*, 107 F.3d 64, 72 (1st Cir. 1997).

## Securities Exchange Act claims

To state a claim under Rule 10b-5 and section 10(b) of the Securities Exchange Act, a plaintiff must allege that the defendant made a misstatement (either a misrepresentation or omission) of material fact, with scienter, in connection with the purchase or sale of securities, upon which the plaintiff relied, and which proximately caused the plaintiff's injuries. *See, e.g., Healthcare Compare*, 75 F.3d at 280. Because a 10b-5 claim is premised upon fraud, Federal Rule of Civil Procedure 9(b) requires that the circumstances constituting the fraud be pled with particularity. *See, e.g., DiLeo v. Ernst & Young*, 901 F.2d 924, 927 (7th Cir. 1990). The PSLRA added to the Securities Exchange Act a requirement that the complaint "specify each statement alleged to have been misleading," and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1). And when, as in a 10b-5 case, the plaintiff's claim depends on proof that the defendant acted with scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* §78u-4(b)(2). The PSLRA also adopted for the Exchange Act a "safe harbor" for forward-looking statements that tracks the parallel provision in the Securities Act. *Id.* §78u-5.

Plaintiffs' Exchange Act claims that are premised on the merger prospectus and registration statement, or on press releases or other communications preceding the merger, fail

for the same reasons their Securities Act claims based on these alleged misstatements fail: the forward-looking statements lie within the safe harbor, and the remaining misstatements are immaterial as a matter of law.

Plaintiffs also argue, however, that the defendants made actionable misstatements following the merger – in Form 10-Q's that Newell Rubbermaid filed in May and August 1999, and in statements defendants allegedly made to market analysts. In large part the alleged misstatements in the 10-Q's are the same ones allegedly found in the February 1999 prospectus: the alleged inflation of revenues and under reporting of expenses, and the purported failure to disclose Rubbermaid's discounting practices and shipping problems. These alleged misstatements are no more material in Newell's post-merger statements than they were in its pre-merger statements. And Newell's claim in the Form 10-Q's that as Rubbermaid was integrated, "the Company expects ... gross margins to improve," Am. Cplt. ¶¶78-79, was nothing more than vague puffery that could not possibly be material to an investor. *See supra* at 12; *Eisenstadt,* 113 F.3d at 746.

The remaining post-merger statements cited by plaintiffs involve statements made by outside financial analysts.[3] Statements made by analysts on July 27 and July 28, 1999 communicated that management still believed that the income enhancements projected in the

---

[3] The September 3 announcement of a lowered earnings estimate is not claimed to be false. Indeed, the sentence in plaintiffs' amended complaint that introduces that announcement says that "[t]he truth finally began to emerge on September 3, 1999." Am. Cplt. ¶83. The September 7 announcement stating that "[t]he Rubbermaid integration remains on plan," *id.* ¶86, postdated the class period and thus cannot be the basis for a claim that any class member was misled in purchasing Newell Rubbermaid stock.

February prospectus could be attained. On August 26, an analyst reported that management was "comfortable" with an estimate that the company would earn $1.80 per share. Plaintiffs allege in their complaint that these statements were based on misstatements (falsehoods and/or omissions) made by the individual defendants and are thus actionable.

We deal first with the August 26 statement. It involved a projection of anticipated earnings. Though Newell Rubbermaid lowered its earnings estimate just one week later, that does not make the earlier statement knowingly false. Even under pre-PSLRA standards, as indicated earlier, plaintiffs are required to allege specific facts indicating that defendants lacked any reasonable basis for this projection at the time they made it. Here they have not done so. The mere juxtaposition of an earnings estimate with a lower actual result is not sufficient to satisfy plaintiffs' pleading burden.

This leaves only the statements by analysts in July 1999 which communicated management's belief that the projected income improvements could be met. Defendants argue, among other things, that these allegations fail to comply with Federal Rule of Civil Procedure 9(b) because they do not specify what any particular defendant said to any particular analyst. They rely on cases holding that Rule 9(b) requires a plaintiff to identify the corporate representative who made the allegedly fraudulent statements to the analyst. *See, e.g., Helwig,* 210 F.3d at 620; *Zvi Trading Corp. v. Ross (In re Time Warner, Inc., Securities Litigation),* 9 F.3d 259, 265 (2d Cir. 1993). In *Zvi Trading,* the Second Circuit stated that "[f]ew reporters or analysts would knowingly abet a fraud, and many will detect and reveal a corporations' efforts to use them as a channel for fraudulent statements .... Thus, the opportunity to manipulate stock prices through the planting of false stories is somewhat limited." *Id. Accord, Helwig,* 210 F.3d

at 620.

This Court does not entirely agree with the Second Circuit's premise. If courts are going to require such attribution in the complaint, that means that as a practical matter, the plaintiff will be out of luck unless the reporter or analyst has "gone public" and identified his specific source without prompting or is willing to disclose that information to a plaintiff's lawyer who seeks voluntary disclosure. Contrary to the Second Circuit's hypothesis that a market analyst will voluntarily identify the corporate representative upon learning that he has been used, it is just as likely that the analyst will not do so, for fear that he will impair his future ability to obtain information from corporate insiders.

We can see no good reason why a defrauded person's right to maintain an action ought to turn on whether an analyst is willing to volunteer the source of his information to a plaintiff's attorney planning litigation. And there is nothing in the Federal Rules of Civil Procedure or the PSLRA which requires a securities fraud plaintiff to be a mind-reader or have a "mole" feeding him inside information. It is well established in this Circuit that a party may be excused from Rule 9(b)'s requirement of pleading with particularity if the information that he is required to plead rests exclusively within the defendants' control or is otherwise unavailable to him. *See Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998); *Goren v. New Vision International, Inc.*, 156 F.3d 721, 729 n. 6 (7th Cir. 1998). In this case, plaintiffs have satisfied the Court that without some discovery, they are unable to identify who said what to which analyst.

This does not mean, however, that plaintiffs are entitled to maintain a 10b-5 claim based on the statements to the analysts that formed the basis for the July 28 and July 29 analysts'

reports, which repeated management's expression of confidence that Newell Rubbermaid would meet its projected income improvements. Management's statements are no less "forward-looking statements" than the original projections themselves. Plaintiffs have not alleged any facts indicating that these expressions of confidence were without basis beyond those they asserted in attacking the original projections; for the reasons previously stated, those allegations are insufficient to satisfy plaintiffs' obligation to specify "the reason or reasons why the statement is misleading" and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(1) & (2).

For these reasons, Count 5 fails to state a claim upon which relief may be granted. Count 6, plaintiffs' "control person" claim under the Exchange Act, fails because it is premised on Count 5.

## Conclusion

For the foregoing reasons, the Court grants defendants' motion to dismiss plaintiffs' amended complaint.

MATTHEW F. KENNELLY
United States District Judge

Date: October 2, 2000